IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOBSON MILLS APARTMENTS, ET. AL. | : | No. 21-00273 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET. AL. | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' BRIEF IN SUPPORT MOTION FOR SUMMARY JUDGMENT**

The plaintiffs respectfully move for summary judgment, as there are no genuine issues of material fact, and the plaintiffs are entitled to judgment as a matter of law.

## INTRODUCTION

This case involves a 2006 agreement between plaintiffs, Dobson Mills and Mansion at Bala, and the defendants. That agreement concerns two parcels of property. One is located at 4041 Ridge Avenue in Philadelphia and is owned by Dobson Mills. The other is located at 4700 City Avenue in Philadelphia and is owned by Mansion at Bala. The agreement states that Dobson Mills and Mansion at Bala shall only contract with union contractors and subcontractors for any improvements to those parcels. That means only construction managers, general contractors, and subcontractors that have collective bargaining agreements with a union affiliated with the Philadelphia Building and Construction Trades Council (the "Unions").

This case seeks a declaratory judgment regarding that agreement. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011, n. 10 (3d Cir. 1980) ("unambiguous writings are interpreted by the court as a question of law.") The Court should make two declarations. First, the Court should declare the agreement void and unenforceable as to plaintiff Dobson Scotts, a successor to Dobson Mills, and to any other future successors to plaintiffs, because Dobson Scotts is not a party to the agreement and the agreement is not real covenant that runs with the land. The court should also declare the agreement void in all respects because it violates section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) and the 5th Amendment to the United States Constitution.

The agreement is not binding on Dobson Scotts – nor any other successors – because Dobson Scotts is not a party to the agreement and the agreement is not a real covenant running with the land. It is a well-established principle of ordinary contract law that a contract cannot impose obligations upon one who is not a party to the contract, *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 663 (1999), and is not binding on future successors. *The Treasure Lake Prop. Owners Ass'n, Inc. v. Meyer*, 832 A.2d 477, 482 (2003). There exists a limited exception to this rule for real covenants "that run with the land." *Id.* It is true that real covenants can be imposed on future successors. *Id.* But the real covenant must be part of a conveyance to do so. *Morning Call, Inc. v. Bell Atl.-Pennsylvania, Inc*, 761 A.2d 139, 142, n. 5 (2000). Moreover, that conveyance must be recorded. 21 P.S. § 356. The 2006 agreement at issue in this case was not created by a conveyance and was never recorded. So, as a

matter of law, the Court should declare that the 2006 agreement is not binding on plaintiff, Dobson Scotts, a successor who is not a party to the agreement, nor is binding on any other future successors of the properties the agreement concerns.

The agreement is also void and unenforceable as to all parties, including plaintiffs Dobson Mills and Mansion at Bala, because it violates Section 8(e) of the National Labor Relations Act. Section 8(e) states that any agreement between an employer and a labor organization whereby the employer refuses to do business with another person or entity is void and unenforceable. *See, Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No.* 100, 421 U.S. 616 (1975); *Larry V. Muko, Inc. v. Southwestern Pennsylvania Bldg. and Const. Trades Council*, 609 F.2d 1368 (3rd. Cir. 1979).

Accordingly, plaintiffs are entitled to judgment as a matter of law.

## UNDISPUTED FACTS

1. **The 2005 Litigation.**

    a. **The state court actions removed to this court.**

In September 2001, Winther Investment, Inc. entered into an agreement of sale for a parcel of land located at 4041 Ridge Avenue. Declaration of Frederic Gautier-Winther (Gautier decl.), ¶ 3[1]. The site contained old industrial buildings that

---

[1] Frederic Gautier-Winther the owner and president of Winther Investment, Inc., and the president and manager of the General Partner for each Dobson Mills, L.P., Dobson Scotts, L.P., and Mansion at Bala, L.P. Gautier decl, ¶ 1. Defendants noticed and scheduled Gautier-Winther's deposition for June 24, 2021. But then cancelled the deposition and never rescheduled it. Therefore, defendants had an opportunity to depose him and chose not to.

were converted into rental apartments by a previous owner in the 1990's. *Id.*, ¶ 4. The

site also contained obsolete industrial buildings that were abandoned. *Id.*, ¶ 5. On

this site, Winther planned to renovate the existing residential buildings and demolish

the abandoned structures to construct additional residential buildings. *Id.*, ¶ 6. In all,

there would be 415 apartment units and 6 retail units and approximately 3.2 acres

of vacant land remaining for future development. *Id.*, ¶ 7. Winther obtained a zoning

permit from the city for that project and then transferred its interest in the property

to Dobson Mills. *Id.*, ¶ 8. Thereafter, Dobson Mills engaged Tocci Building

Corporation to act as the general contractor for the project and began construction.

Id., ¶ 9. Tocci was not affiliated with the Unions. *Id.*, ¶ 10.  Tocci was also responsible

for hiring all subcontractors and suppliers on the project. *Id.*, ¶ 11.

Once construction began, various unions began picketing the site. *Id.*, ¶ 12. On

October 26, 2005, there was a protest at the site involving an estimated 2,000 person,

including (then) Councilmember Michael Nutter and members of the unions. *Id.*, ¶

13.

On October 27, 2005, Councilmember Nutter introduced a resolution to

Philadelphia City Council that instructed the city's Law Department to institute a

legal action against Winther and Tocci. A copy of that resolution is attached at exhibit

1[2]. The resolution requested that the Law Department initiate litigation to "secure

full compliance with the Philadelphia Building Code and with the terms and

conditions of a zoning permit issued for the residential development project located

---

[2] Declaration of Walter S. Zimolong, Esq., ¶ 4.

at 4041 Ridge Avenue, including if necessary, filing for a Temporary Restraining Order to stop construction until compliance is achieved." *Id.*

Speaking in support of his resolution, Councilmember Nutter stated the resolution concerned the "general issue of how construction projects and development projects in the City are monitored by the various agencies" and the "issues of competency of the work force, composition of the work force and similar issues." Council of the City of Philadelphia, 10/27/05, 54:23-25, 55:1-6 at exhibit 2[3]. Councilmember Nutter also referred the union protest at 4041 Ridge Avenue site. *Id*, 55:12-22. He said the resolution would benefit various interest groups "[w]hether it's union, African-Americans, workers, contractors...." *Id.,* 56:1-7.  Nutter apparently believed that Winther, during the zoning process, made certain commitments regarding those use of labor from these interest groups and stated that the resolution was designed to:

> "address the issue of when entities come before City agencies and make statements on the record to how they will conduct themselves, those commitments should be carried through. They be followed through, and if not, then we should find ourselves in court addressing those particular issues.
>
> And so this resolution seeks to put forward the opportunity for us to either get representation by the Law Department or outside counsel, if necessary, to seek a temporary restraining order with regard to that development activity to get to the hear of the matter, which is when people make commitments, whether its to us as elected officials or to City agencies on the record, those commitment must be followed through."

*Id.,* 56:8-25, 57:1-7.

---

[3] Zimolong decl., ¶ 5.

Councilmember Nutter concluded his remarks by declaring the litigation was designed to "get what is properly owed to the citizens of this City." *Id.*, 60:1-3

On November 18, 2005, the city filed a complaint and petition for a permanent injunction against Winther and Tocci. Copies of these filings are attached at exhibits 3, and 4, respectively. On December 5, 2005, the complaint and petition were removed to this Court at docketed at 2:05-cv-06236-JCJ and 2:05-cv-06237-JCJ, respectively. *Id.*

### b.  The state court action to revoke Mansion at Bala's zoning permit.

The same day the city filed its complaint for specific performance and petition for an injunction on the ongoing project located at 4041 Ridge Avenue, Councilmember Nutter filed a separate action in the form of an appeal of a zoning permit issued to Mansion at Bala for its project located at 4700 City Avenue.  A copy of the docket for that appeal is attached at exhibit 5[4]. That project was for the development of residential apartment buildings at 4700 City Avenue. Nutter's appeal sought a revocation of the zoning permit issued to Mansion at Bala for the 4700 City Avenue project.

### 2.  The 2006 Settlement Agreement.

On May 30, 2006, Dobson Mills, Mansion at Bala, the city, and the Unions settled both the litigation removed to this Court and the zoning appeal by executing a settlement agreement, which is the subject matter of this litigation. A true and correct copy of the agreement is attached at Exhibit 6, see Def's Ans. to Request for

---

[4] Zimolong decl., ¶ 6.

Admission 1, ex.7. Dobson Scotts is not a party to the agreement. *Id*. That agreement was never recorded.

Paragraph 2 of the agreement states:

"Bala Owner hereby agrees that any contract it enters into for the performance of Covered Work will only be with a construction manager, general contractor, and/or subcontractor which is (are) signatory (ies) to the said Trades Council Agreement and to the appropriate, specific craft agreement(s) with the Union(s) having traditional and customary jurisdiction over the work performed by that contractor or subcontractor, (hereafter "Covered Work Contract"). "Covered Work," for purposes of this paragraph 2, is new construction to be performed at the Bala Site, whether the First or Second Phase Projects currently approved by the Zoning Board or such other project(s) which may be hereinafter approved by the Zoning Board."

Agreement, ¶ 2.

Under the agreement, Mansion at Bala completed the Bala First Phase on a portion of the site located 4700 City Avenue using a general contractor who was a signatory with the Unions. Construction of the Bala First Phase began in 2008 and was completed several years later. Gautier decl., ¶ 14, 15. There has never been a Bala Second Phase and the vacant land remaining on the parcel at 4700 City Avenue remains has not been developed. *Id.*, ¶ 16.

Paragraph 3 of the agreement varies slightly and states:

"Dobson Owner hereby agrees that any contract it enters into for the performance of Covered Work on the Dobson Mills Second Phase Project will only be with a construction manager, general contractor, and/or subcontractor which is (are) signatory (ies) to the said Trades Council Agreement and to the appropriate, specific craft agreement(s) with the Union(s) having traditional and customary jurisdiction over the work performed by that contractor or subcontractor, (hereafter "Covered Work Contract"). "Covered Work," for purposes of this paragraph 3, is future new construction to be performed at the Dobson Mills Site,

whether the Dobson Mills Second Phase Project currently contemplated or such other project which may be hereinafter approved by the Zoning Board. **"Covered Work" does not include work or construction activities performed on the "Existing Dobson Residences" or the Dobson Mills First Phase Project."**

Agreement, ¶ 3 (emphasis added).

The Existing Dobson Residences and the Dobson Mills First Phase Project is that project located at 4041 Ridge Avenue, where the union protest with Councilmember Nutter occurred. *Id.*, ¶ 17. That is also the project for which the Resolution was passed and from which the City's litigation arose. *Id.*, ¶ 18. Importantly, **paragraph 3 did not prohibit Dobson Mills from using non-union labor on Dobson Mills First Phase** and Dobson Mills was permitted to continue construction (and did) of that phase using its existing non-union work force hired by Tocci. *Id.*, ¶ 19. Rather paragraph 3 applied to any future and potential Phase 2 development on the vacant land remaining of the parcel located at 4041 Ridge Avenue. Dobson Mills has never constructed a Phase 2. *Id.*, ¶ 20.

### 3. Dobson Scotts acquires a portion of 4041 Ridge Avenue.

Although not a party to the Agreement, Dobson Scotts acquired the vacant and undeveloped portion of the 4041 Ridge Avenue parcel from Dobson Mills, which had been subdivided into a separate property with an address of 4021 Ridge Avenue. *Id.*, ¶ 21. On December 12, 2019, Dobson Scotts obtained a zoning permit for 4021 Ridge Avenue. *Id.*, ¶ 22. On August 11, 2020, Dobson Scotts obtained a building permit for 4021 Ridge Avenue for the construction of a privately funded 133-unit multi-family project. *Id.*, ¶ 23.

### 4. Mansion at Bala remaining development rights.

Mansion at Bala can construct up to 175 additional units on the remaining vacant portion of its parcel located at 4700 City Avenue. *Id.*, ¶ 24. It would like to further develop that vacant portion of the property or sell or transfer all or part of the 4700 City Avenue property to a third-party. *Id.*, ¶ 25.

## ARGUMENT

## I.   THE 2006 AGREEMENT IS NOT A REAL COVENANT AND DOES NOT BIND DOBSON SCOTTS AND OTHER FUTURE SUCCESSORS.

Before addressing the questions of whether the agreement is void under federal labor law, the Court can apply basic contract law to declare the agreement does not bind any non-signatories or successors. The agreement is not binding on Dobson Scotts, a non-signatory, nor any other successor to plaintiffs, because they are not parties to the agreement, and it does not run with the land.

It is a well-established principle of ordinary contract law that a contract cannot impose obligations upon one who is not a party to the contract, *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 663 (1999), and which does not state it is binding on future successors. *The Treasure Lake Prop. Owners Ass'n, Inc. v. Meyer*, 832 A.2d 477, 482 (2003). There exists a limited exception to this rule for real covenants "that run with the land." *Id.* Real covenants can be imposed on future successors. *Id.* But those covenants require a conveyance to be created, *Morning Call, Inc. v. Bell Atl.- Pennsylvania, Inc*, 761 A.2d 139, 142, n. 5 (2000). Furthermore, that conveyance must be recorded. 21 P.S. § 356.

These conditions are not present in the agreement. First, plaintiff Dobson Scotts is not a party to the agreement. So, the agreement cannot bind it. Next, the agreement does not contain a clause binding future successors and assigns. So, not only does it not bind Dobson Scotts but it does not bind any other successor either. Finally, the agreement is not a conveyance. It did not convey any real property. Rather, it was executed to settle litigation.  It also was never recorded.

21 P.S. § 356 requires agreements concerning real property "of a permanent nature" shall be recorded with the recorder of deeds. Section 356 states:

> "**All agreements in writing relating to real property** situate in this Commonwealth **by the terms whereof** the parties executing the same do grant, bargain, sell, or convey any **rights or privileges of a permanent nature pertaining to such real property**, or do release the grantee or vendee thereunder against damages which may be inflicted upon such real property at some future time, shall be acknowledged according to law by the parties thereto or proved in the manner provided by law, and **shall be recorded in the office for the recording of deeds in the county or counties wherein such real property is situate.**"

21 Pa. Stat. Ann. § 356

Under Section 356 a covenant running with the land must be recorded to be binding. "[T]he word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, —— U.S. ——, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020); *see also* Scalia & Garner, Reading Law 112 ("When drafters use shall and may correctly, the traditional rule holds—beautifully.") Defendants' position is that the restriction to use union only labor to improve the Subject Properties is permanent in nature (otherwise the matter would not be before the court.)  The statute says for that to occur the agreement must be recorded. Here, that never happened.

Thus, as a matter of law, the Court should grant summary judgment and declare that the 2006 agreement is not binding on plaintiff, Dobson Scotts, a successor who is not a party to the agreement, nor binding on any other future successors to the owners of the properties subject to the agreement.

## II.   THE 2006 AGREEMENT IS VOID AND UNENFORCABLE BECAUSE IT VIOLATES FEDERAL LAW.

Common law contract principles are not the only reason to void the agreement. The agreement is also void and unenforceable in all respects – even to the signatories – because it violates federal labor law. The agreement violates federal labor law because it is a so called "hot cargo agreement," which is an agreement between a labor union and an employer whereby the employer agrees not to do business with a third party. *Spectacor Mgmt. Grp. v. N.L.R.B.*, 320 F.3d 385, 390 (3d Cir. 2003). Under section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), such agreements are void and unenforceable. *See also*, *Id.* at 392 ("We have made clear that hot cargo clauses may be invalid per se if the provision is " 'secondary in [its] purpose as well as [its] result.'")

Section 8(e) states:

**"Enforceability of contract or agreement to boycott any other employer; exception**

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any

of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing **such an agreement shall be to such extent unenforcible1 and void**: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection and subsection (b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

29 U.S.C.A. § 158 (e)(emphasis added)

An agreement between a labor union and employer with whom it has no existing collective bargaining relationship that requires that employer to utilize only union labor for a construction project violates section 8(e). *Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616 (1975); *Larry V. Muko, Inc. v. Southwestern Pennsylvania Bldg. and Const. Trades Council*, 609 F.2d 1368 (3rd. Cir. 1979); and *Glens Falls Bldg. & Constr. Trades Council*, 350 NLRB 417 (2007) ("Indeck").

In *Connell* the issue before the Supreme Court was identical to that before this Court. So was the procedural posture. In that case, the building trades union, Local 100, picketed a general contractor, Connell Construction, for the purpose of obtaining an agreement with it whereby the general contractor would only let subcontracts for

mechanical contracting work to union affiliated with the union. *Connell*, 421 U.S. at 618. The picketing succeeded and Connell executed an agreement with Local 100. Id. at 619. Connell then filed a declaratory judgment action claiming the agreement violated section 1 and 2 of the Sherman Act. The Supreme Court held that the agreement could violate the Sherman Act and that section 8(e) did not shelter it from those antitrust laws.

While Connell was an antitrust case, its holding is important because the Supreme Court examined whether the agreement in question violated Section 8(e) of the National Labor Relations Act. Local 100 argued that the agreement was permitted under Section 8(e) and, therefore, the Court should defer to the National Labor Relations Act. *Id.* Local 100 argued that under the "construction industry" proviso to section 8(e) the agreement in question was permitted under Section 8(e). Under the construction industry provisio in Section 8(e), an agreement between a union and a "construction industry employer" that prohibited subcontracting to only union firms fell outside the auspices of Section 8(e). *Id.* at 627.

Connell countered the construction industry proviso only applied to situations were there was an existing collective bargaining relationship with the union. *Id.* And that the provision did not permit a union, like here, "to approach a 'stranger' contractor and obtain a binding agreement not to deal with nonunion subcontractors." *Id.* at 627-628.

The Court agreed with Connell. It held that the construction industry proviso in Section 8(e) "extends only to agreements in the context of collective-bargaining

relationships and in light of congressional references to the *Denver Building Trades* problem, possibly to common-situs relationships on particular jobsites as well." Id. at 633. The Supreme Courts reference to the *Denver Building Trades* problem means the agreement is used as a vehicle to prohibit friction between union and non-union employees working side-by-side.

In *Larry V. Muko, Inc.,* the Third Circuit addressed the validity of an agreement under section 8(e). Larry V. Muko, Inc., 609 F.2d at 1368. That case also arose out of a claim under the Sherman Act. Muko was a non-union general contractor who brought an antitrust claim against the Southwestern Pennsylvania Building and Construction Trades Council. Muko claimed that an agreement between Silver's and the trades council violated the Sherman and Clayton Acts. That agreement, like the agreement here, barred Silver's from awarding construction contracts with any contractor or subcontract who did not have a collective bargaining agreement with a union affiliated with the trades council. *Id.* at 1370.

In that case, the unions picketed and protested Silver's construction projects. *Id.* at 1371. Wanting the picketing and protests to end, Silver's entered into an agreement, like the agreement here, whereby it agreed to use only union labor on future construction projects. *Id.* Muko had worked with Silver's previously and wanted to continue building restaurants for it. *Id.* Silver's asked Muko if it would build as a union contractor and Muko refused. *Id.* It was subsequently asked not to build on any further jobs by Silver's. *Id.*

The trial court granted the trades council a directed verdict and the Third Circuit overturned. It held that a directed verdict was only properly if the agreement was exempt from antitrust scrutiny. *Id.* The Court looked to *Connell* for guidance. It affirmed that under Connell an agreement, like the agreement here, is not valid under section 8(e) unless it arises out of an existing collective bargaining relationship or is limited to a particular job site to reduce job site friction between union and non-union workers. *Id.* at 1374. The Court concluded that absent those circumstances a jury could have found the agreement fell "within the prohibition of [section] 8(e) since it required Silver's to "cease doing business" with Muko and all other nonunion contractors." *Id.* This is precisely what the agreement does here.

Finally, in *Indeck* the National Labor Relations Board had held that an agreement, identical to the agreement here, whereby an employer and a union agree not to permit contracting or subcontracting non-union firms violated Section 8(e) and was void. Indeck, like plaintiffs, was the owner of real estate, specifically a cogeneration power plant. *Indeck*, 350 NLRB at 418.  Like plaintiffs, it did not employ any workers in the building and construction trades. Id. Indeck wanted to build four cogeneration electric facilities. One of those facilities was located in Olean, New York. Indeck engaged CRS Serrine as the project manager for the Olen project. Following discussion with the local building trades, Indeck instructed its project manager, Serrine, to execute an agreement with the building trades that, like here, stated:

> "Sirrine agrees that any contractor or subcontractor which is employed on the Project shall be a signatory to and abide by all of the terms contained in the Project Labor Agreement for the Indeck - Corinth Limited Partnership Cogen Project, Corinth, New York (hereinafter "The

Project Agreement"). A copy of the Project Agreement negotiated by Sirrine and the [Respondent Trades Council] is attached. Sirrine will not be a signatory to the Project Agreement itself."

*Id.* at 420 (2007)

Later, before any construction work began on the Olean project, a dispute arose between Indeck and Serrine that caused Indeck to replace it with another project manager, CNF Constructors, Inc. *Id.* CNF did not sign an agreement with the unions. *Id.* The unions sued Indeck for breach of contract. In defense of that lawsuit, Indeck, like plaintiffs here, claimed that any agreement to construct the Olean project using only union labor was void and unenforceable under section 8(e) of the National Labor Relations Act. *Id.* Indeck also filed an unfair labor practice charge against the unions with the National Labor Relations Board asking it to declare any agreement for the Olean Project which required Indeck to use only union labor void and enforceable under section 8(e). *Id.* The Labor Board declared the agreement void and unenforceable and ordered the unions to cease and desist from taking any further actions to enforce the agreement.

In declaring the agreement void under section 8(e), the Board analyzed the agreement under *Connell*. The Board held that for an agreement to be valid under section 8(e) it first must be entered into between a union and a construction industry employer. Then, if it is, it must meet one of the two criteria (a) it must be entered into in the context of an existing collective bargaining relationship or (b) to alleviate job site friction caused by union and non-union employees working side-by-side (the

*Denver Building Trades* problem). *Id* at 412 (citing *Connell*, 421 U.S. at 633.) The Board held the unions in *Indeck* failed to establish either of these criteria. *Id.*

Like the agreement here, the Board held that the agreement in Indeck did not arise in the context of an existing collective-bargaining relationship. Like the agreement here, there was no collective bargaining relationship between Indeck and the unions and the unions did not seek to represent the employees of Indeck. The Board also held that the purpose of the agreement, like the agreement here, was not to alleviate union and non-union friction at the jobsite, rather it was to remove union opposition to the regulatory approval for the project. *Id.* Thus, the Board held the unions violated Section 8(e) of the National Labor Relations Act by executing the agreement and ordered the unions to cease and desist from taking any action to enforce the agreement. *Id.*

Applying *Connell* and *Indeck*[5] to this case commands a similar result. First and foremost, plaintiffs are not construction industry employers. They are real estate developers. They do not employ members of the building and construction trades. Because the construction industry proviso in Section 8(e) applies only to agreements executed between unions and construction industry employers the proviso does not save the agreement.

---

[5] Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) "it is appropriate to defer to the reasonable statutory interpretation of the Board, the agency primarily charged with the Act's implementation and administration." *Spectacor Mgmt. Grp.,* 320 F.3d at 396 (citing *Chevron*).

Still, even if plaintiffs were construction industry employers, which they are not, the proviso would not apply because (a) there was no preexisting collective bargaining relationship between plaintiffs and the unions or (b) there is no evidence that the agreement was designed to alleviate job site friction.

Regarding the first prong the unions admit that there never has been a collective bargaining relationship between the unions and the plaintiffs. And that the agreement did not arise from a collective bargaining relationship. Indeed, the unions admit the agreement is not a collective bargaining agreement. Patrick Gillespie, who executed the agreement on the Union's behalf, testified:

> "Q.    Is the agreement that we've marked as P-1 a collective bargaining agreement?
>
>      Ms. Ehrenberg: Objection.
>
>      The Witness: No."

Gillespie dep., 33:20-23 at exhibit 9.

When asked why the agreement was not a collective bargaining agreement, Gillespie explained: "it's not. I mean, it's – it has no terms or conditions in it dealing with individual unions." *Id.*, 35:7-9. Rather Gillespie testified the agreement is precisely the type of agreement that *Connell* and *Indeck* say violates Section 8(e):

> "What this says is that the developer will behave in a certain way to track (sic)[6] out only to people who are signatories to collective

---

[6] As recorded in transcript, should probably be "contract."

bargaining agreement with the Philadelphia Building and Construction

Trades Council."

*Id.*, 35:10-14.

The second prong is also not present because the agreement relates to future projects where no work has yet been performed. Therefore, the agreement was not designed to alleviate friction between union and non-union workers working on the same job site. To the contrary, the agreement did not apply to the Dobson Mills First Phase, which was where the large labor protest occurred. The agreement exempted that first phase of the 4041 Ridge Avenue project and Dobson Mills was permitted (and did) complete it with non-union contractors hired by Tocci. There is also no language in the agreement that states it was executed to alleviate such friction. The language of the agreement states it was executed to settle litigation brought by the City and Councilmember Nutter, not to alleviate job site friction among union and non-union employees. Agreement, 2-3.

Accordingly, the construction industry proviso does not apply. The agreement violates section 8(e). The Court should grant summary judgment to plaintiffs and declare the agreement void and unenforceable.

### III.   THE 2006 AGREEMENT IS AN UNLAWFUL TAKINGS IN VIOLATION OF THE 5TH AMENDMENT.

Under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, an individual is free to join or refrain from joining a labor union. Also, under section 8(a)(1), 29 U.S.C. § 158(a)(1), it is an unfair labor practice for an employer to interfere

with an employee's exercise of these rights. Thus, the Third Circuit holds that the NLRA "preempts any state or local law that regulates conduct falling within sections 7 or NLRA." *Associated Builders & Contractors Inc. New Jersey Chapter v. City of Jersey City, New Jersey*, 836 F.3d 412, 417 (3d Cir. 2016) Likewise, under the "unconstitutional conditions" doctrine, the City may not require a person to give up a right – in this case the right not to interfere with an employee's right to join or refrain from joining a union - in exchange for the City dismissing litigation, where the benefit sought has little or no relationship to the property. *Dolan v. City of Tigard*, 512 U.S. 374, 385, 114 S. Ct. 2309, 2317, 129 L. Ed. 2d 304 (1994).

It is true that the City possesses certain policy powers to regulate land use *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, (1926) But the City does not enjoy unlimited power to regulate all ownership rights in private property. Epstein, 179. To be valid a land use regulation must "substantially advance[s] legitimate state interests" and not "den [y] an owner economically viable use of his land." *Agins v. City of Tiburon*, 447 U.S. 255, 260, (1980). If the City cannot show that the regulation advances a legitimate state interest or that a development condition serves the same purpose as an outright ban "the building restriction is not a valid regulation of land use but "an out-and-out plan of extortion." *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837, (1987).

The city's requirement that plaintiffs use union labor for the construction of privately funded projects is not a proper exercise of the city's police power. It serves no legitimate state interest – only political ones. As Justice Scalia would put it – it is

an out-and-out plan of extortion. *Id.* The city admits it does it is not aware of any permit it issued that required the use of union labor. City Ans. to Int. 3, at Ex. 8. The agreement did not even apply to the project that gave rise to the litigation – Dobson Mills Phase One. This is the project where the alleged commitments were made by Winther, who transferred its rights to the property to Dobson Mills. Those commitments did not matter once the concession to use union labor for future construction projects at the two properties was extracted from plaintiffs. The agreement therefore had nothing to do with securing compliance with the building or zoning permits and everything to do with political paybacks.

This is a blatant unconstitutional exaction.

## CONCLUSION

Based on the foregoing, plaintiffs respectfully request that the Court grant summary judgment in their favor and declare any provisions of the 2006 settlement agreement requiring plaintiffs and any successor to contract only with a construction manager, general contractor, and/or subcontractor affiliated with the Unions, including, without limitation paragraphs 2 and 3, void and unenforceable.

Respectfully submitted,

*/s/ Walter S. Zimolong, Esq.*
Walter S. Zimolong, Esquire
ZIMOLONG, LLC
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
wally@zimolonglaw.com
*Attorneys for Plaintiffs*

Dated:  August 4, 2021

## CERTIFICATE OF SERVICE

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Eastern District of Pennsylvania.  I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Date:  June 14, 2021                                      */s/ Walter S. Zimolong, Esquire*