**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DOBSON MILLS** *et al.* | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 21-273** |
| | : | |
| **CITY OF PHILADELPHIA** *et. al.* | : | |

**MCHUGH, J.**                                                     **September 22, 2022**

## MEMORANDUM

This is an unusual declaratory judgment action in which Plaintiffs challenge the validity of a settlement agreement they entered into more than fifteen years ago. The underlying case was an enforcement action brought by the City of Philadelphia arising from construction at a development site.  In that action, the City alleged that the site developer had breached commitments it made when it was granted zoning variances necessary for the project to proceed, and that the developer was engaging in practices that violated the City Code.  Plaintiffs removed the case to this court, and approximately seven months later a full settlement agreement was negotiated by counsel.  The parties met their respective obligations under that agreement, and the projects subject to that agreement were completed.

The underlying enforcement action brought by the City involved a specific site, but the settlement agreement extended to other parcels and involved other entities, including the Building and Construction Trades Council on the part of the City and other investors on the part of the developer.  Those investors now seek a declaration stating that they can proceed with new development projects without being bound by the settlement agreement they signed.  Both sides have briefed a multitude of issues ranging from laches to the Sherman Act.  But after close scrutiny

of the posture of this dispute, I conclude that there is no current case or controversy, requiring that the action be dismissed.

Facts and Procedural History[1]

Plaintiffs here are Dobson Mills Apartments L.P., Dobson Scotts, L.P., and Mansion at Bala, L.P., all partnerships formed under Texas law. Dobson Mills and Mansion at Bala were parties to the underlying settlement agreement, which was also signed by Winther Investments, Inc. Frederic Gautier-Winther is the owner and president of Winther Investment, Inc., and the president and manager of the General Partner for each of the plaintiff entities: Dobson Mills Apartments, L.P., Dobson Scotts, L.P., and Mansion at Bala, L.P. Gautier-Winther Decl. ¶ 1, ECF 28-3. The City was the opposing party to the agreement, joined by the Pennsylvania Building and Construction Trades Council. Settlement Agreement, Ex. 6 to Pls.' Mot. Summ. J., ECF 37-10. The facts leading up to the settlement agreement are as follows.

   a. *Winther Investment's Development Plans and Subsequent Litigation*

In the early 2000's, Winther Investment, Inc., purchased property in Philadelphia. Gautier-Winther Decl. at ¶ 3. Those properties are 4041 Ridge Avenue (now 4055 Ridge Avenue and 4021 Ridge Avenue) (the "Dobson Site") and 4700 City Avenue (the "Bala Site") (collectively, the "Subject Properties"). Second Am. Compl. at ¶¶ 14–16. In September 2001, Winther Investment, Inc. entered into an agreement of sale for a parcel of land located on 4041 Ridge Avenue with the intent to develop apartment and retail units. Gautier-Winther Decl. ¶¶ 3, 7. After obtaining a

---

[1] This action was reassigned upon the retirement of Judge Joyner, who had also presided over the underlying action. Multiple motions were pending at the time of reassignment. Plaintiffs requested that I honor Judge Joyner's projected trial date, which my docket did not allow. The City requested that I defer discovery until after I ruled on its motion to dismiss. I denied the City's request and ordered the parties to proceed with discovery. The parties then filed cross motions for summary judgment. I therefore have a developed record on which to assess whether there is a controversy that merits declaratory relief.

permit from the City for that project, Winther Investment transferred its interest in the property to Dobson Mills. *Id.* ¶ 8. Dobson Mills then engaged Tocci Building Corporation, which was not affiliated with any union, to act as a general contractor for the project. *Id.* ¶¶ 9, 10.

Unions began picketing the site. *Id.* ¶ 12. Then Councilmember Michael Nutter had participated in community meetings about zoning pertaining to the site and apparently viewed the lack of union contractors as a breach of his conditions for support. He introduced a resolution to Philadelphia City Council, which was subsequently adopted, "[a]uthorizing a request to the Law Department to represent City Council to secure full compliance with the Philadelphia Building Code and with the terms and conditions of a zoning permit issued for the residential development project located at 4041 Ridge Avenue, including if necessary filing for a Temporary Restraining Order to stop construction until compliance is achieved." City of Philadelphia Resolution, Ex. 1 to Pls.' Mot. Summ. J., ECF 37-5. On November 18, 2005, the City filed a complaint and petition for an injunction against Winther and Tocci, citing their "failure and/or refusal to maintain ongoing construction work at the subject premises in compliance with the [Philadelphia] Code." *Id.*; Notice of Removal, Ex. 4 to Pls.' Mot. Summ. J, ECF 37-8. Such violations included "unlicensed contractors, working without permits, and permits not posted." Underlying Compl., Ex. 3 to Pls.' Mot. Summ. J, ECF 37-7. Separately, Councilman Nutter also filed an action challenging the zoning permit issued to Mansion at Bala for its project located at 4700 City Avenue. Zoning Action, Ex. 5 to Pls.' Mot. Summ. J., ECF 37-9.[2] The defendants in the enforcement action invoked diversity jurisdiction and removed the City's enforcement action to this Court.[3]

---

[2] Over the City's objection, I permitted Plaintiffs to depose former Councilman, and later Mayor Nutter. Plaintiffs have not, however, submitted any portion of his testimony for my consideration.

[3] Civil Action No.'s 05-6236, 05-6237.

*b.  The Settlement Agreement*

On May 30, 2006, the parties entered into a settlement agreement (the "2006 Settlement")

that concluded federal court litigation between the City and Winther Investments, Inc. As noted

above, in addition to Winther Investments and the City of Philadelphia, the parties to the settlement

agreement include Dobson Mills and Mansion at Bala, and, on the other side, the Pennsylvania

Building and Construction Trades Council and AFL-CIO, on behalf of itself and Affiliate unions.

*See* Settlement Agreement. [4]  Part of the consideration for the 2006 Settlement was a commitment

by the signatories to utilize certain labor practices for future work at the Dobson Site and Bala Site

in exchange for a broad release of claims.  Settlement Agreement at ¶¶ 2–3, 9.

Specifically, the settlement agreement included that:

Bala Owner hereby agrees that any contract it enters into for the performance of
Covered Work will only be with a construction manager, general contractor, and/or
subcontractor which is (are) signatory (ies) to the said Trades Council Agreement
and to the appropriate, specific craft agreement(s) with the Union(s) having
traditional and customary jurisdiction over the work performed by that contractor
or subcontractor, (hereafter "Covered Work Contract"). "Covered Work," for
purposes of this paragraph 2, is new construction to be performed at the Bala Site,
whether the First or Second Phase Projects currently approved by the Zoning Board
or such other project(s) which may be hereinafter approved by the Zoning Board."
*Id.* at ¶ 2.

…

Dobson Owner hereby agrees that any contract it enters into for the performance of
Covered Work on the Dobson Mills Second Phase Project will only be with a
construction manager, general contractor, and/or subcontractor which is (are)
signatory (ies) to the said Trades Council Agreement and to the appropriate,
specific craft agreement(s) with the Union(s) having traditional and customary
jurisdiction over the work performed by that contractor or subcontractor, (hereafter
"Covered Work Contract"). "Covered Work," for purposes of this paragraph 3, is
future new construction to be performed at the Dobson Mills Site, whether the
Dobson Mills Second Phase Project currently contemplated or such other project
which may be hereinafter approved by the Zoning Board. "Covered Work" does
not include work or construction activities performed on the "Existing Dobson
Residences" or the Dobson Mills First Phase Project." *Id.*, at ¶ 3.

---

[4] The contractor, Tocci Building Corporation, was dismissed and is not a signatory.

The settlement agreement did not prohibit Dobson Mills from using a non-union workforce in completing Phase One of the project. Answers to Defs.' Interrogs. at ¶ 10, Ex. K to Def's Mot. Summ. J., ECF 41-13; Settlement Agreement at ¶ 3.

In signing the agreement, Winther and Dobson Owner "release[d] and discharge[d] the City and all its agents, officers, and employees of and from all actions, causes of action, suits....known or unknown, that Winther and Dobson Owner now have, ever had, or hereafter shall or may have against the City for or by reason of any matter or thing arising out of or in any way related to the subject matter" of these actions.  Settlement Agreement at ¶ 9.  The parties to the settlement agreement were "represented by counsel of their choice" and the "wording and intent of th[e] Agreement [was] reviewed and accepted by counsel for all the parties prior to being signed by them." *Id.* at ¶ 14.  Moreover, the "parties...jointly participated in the drafting of th[e] agreement." *Id.* [5]

### c.  The Completion of Projects at Dobson Mills and Bala

Following the execution of the 2006 Settlement, Dobson Mills completed the then-ongoing project at the first Dobson Site using the existing non-union workforce hired by Tocci.  Answers to Defendants' Interrogatories at ¶ 10.  Between 2009 and 2011, Winther also completed a development project at the Bala Site at 4700 City Avenue, which consisted of the construction of a 276-unit multi-family project.  *Id.* The development project at the Bala Site (Phase One) complied with the obligation to utilize PBCTC signatory contractors.  *Id.*  at ¶ 11. After the parties had completed Phase One of the Dobson project and phase two of the Bala project, vacant land

---

[5] Plaintiffs now contend that, despite being represented by highly experienced and capable counsel, they entered into the 2006 settlement as a result of "pressure" that "forced" them "to seek the quickest possible resolution." Second Am. Compl. ¶¶ 33–35.

remained on both properties.  The Dobson parcel contains 3.2 acres of vacant land and the Bala

parcel contains 2.13 acres of vacant land.  *Id.* at ¶ 12.

   *d.   The Future Projects*

In 2017, approximately ten years after the settlement was entered, Dobson Scotts, a later-

formed Winther Investments entity that was not a party to the 2006 settlement agreement, acquired

the vacant and undeveloped portion of the 4041 (now 4055) Ridge Avenue parcel from Dobson

Mills, which had been subdivided into a separate property with an address of 4021 Ridge Avenue.

Gautier-Winther Decl. at ¶ 21.  The parcel Dobson Scotts acquired consists of 3.2 acres of vacant

land. Answers to Defendants' Interrogatories at ¶ 12.   On December 12, 2019, Dobson Scotts

obtained a zoning permit for 4021 Ridge Avenue.  Gautier-Winther Decl. at ¶ 22.  On August 11,

2020, Dobson Scotts also obtained a building permit for 4021 Ridge Avenue for the construction

of a privately funded 133-unit multi-family project.  *Id.* at ¶ 23.  Finally, Dobson Scotts received

the City's approval of a 10-year tax abatement for the project.  *Id.*

Mansion at Bala still owns 2.13 acres of vacant land located at 4700 City Avenue, where

the multi-family project (Phase One project) was developed. Answers to Defendants'

Interrogatories at ¶ 12. Through counsel, Winther Investments has advised the City that if

development proceeds, it will create another new entity akin to Dobson Scotts which, like Dobson

Scotts, would not have been a party to the 2006 Agreement.  Resp. Opp. Mot. Dismiss at 16-17,

ECF 34.[6]  It will either further develop that vacant portion of the property or sell or transfer all or

part of the 4700 City Avenue property to a third-party. Gautier-Winther Decl. at ¶ 25.

---

[6] Specifically, Plaintiffs discuss "transferring or selling the parcels to an affiliated entity or a third-party
entity" if a declaratory judgment is not granted in their favor.  Resp. Opp. Mot. Dismiss at 16-17.

e. *The Present Litigation*

Plaintiffs now want to determine whether they can develop the properties without complying with the terms of the settlement agreement into which they previously entered. Plaintiffs argue that "although they have received all permits and approvals required to start construction" at the Dobson Scotts project, the "project is essentially at a standstill" because of the earlier settlement agreement.  Resp. Opp. Mot. Dismiss, ECF 25.  They point to no legal action or threat of legal action against them, and every request they have made of the City has been granted.   Nonetheless, Plaintiffs contend that because they have asked both the City and the Building Trades Council to take a position as to the applicability and enforceability of the 2006 Agreement and did not receive a response, they purportedly cannot proceed with construction because they do not know whether a choice to use non-union labor might result in legal action against them.  *Id.*  They further cite the risk of their tax abatement or permits expiring as a potential harm, but in the Spring of 2020, the City "provided Plaintiffs with a detailed explanation for how to obtain extensions of their permits [and] indicated that it would not oppose Plaintiffs' efforts to obtain the extensions."  Def's Mot. Summ. J. at 6 n. 6.  When pressed at argument to identify the source of their alleged injury, Plaintiffs' position was that the absence of a response from the City as to the scope of the 2006 agreement was enough to create a justiciable controversy. Tr. at 22:24-23:7, ECF 57.

Plaintiffs seek two declarations from the Court: first, that the settlement is unenforceable as to plaintiff Dobson Scotts and any future successors to Plaintiffs; and second, that the settlement is void in all respects on the basis of various legal theories spread across an original and two amended complaints, including violations of the Constitution, violations of the National Labor Relations Act, and violations of the Sherman Act.

Three motions remain pending: Defendants' Motion to Dismiss the Second Amended Complaint, ECF 33, and the cross-motions for summary judgment, ECF 37, ECF 41. Defendants' cross-motion renews and amplifies the motion to dismiss.

I.     Legal Standard

The cross-motions for summary judgment are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

 "'A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action . . .'" *Frett–Smith v. Vanterpool,* 511 F.3d 396, 399 n.3 (3d Cir. 2008) (quoting *Kontrick v. Ryan,* 540 U.S. 443, 445 (2004)).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  *See* Fed. R. Civ. Pro. 12(h)(3).

II.     Discussion

Federal courts may only resolve actual "cases" and "controversies."  *See* U.S. Const. art. III, § 2. The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief.  *See Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83 (1993); *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671 (1950).  If there is no case or controversy at issue, the Court does not have jurisdiction.  *See Hamilton v. Bromley*, 862 F.3d 329, 337 (3d Cir. 2017) (citing *United States v. Thomas*, 713 F.3d 165, 168 (3d Cir. 2013)) (a "judicial decision rendered in the absence of a case or controversy is advisory, and federal courts lack power to render advisory opinions.");  *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

Having considered the parties' lengthy submissions, and heard argument, Defendants have persuaded me that this Court lacks jurisdiction because there is at present no case or controversy. Plaintiffs argue that uncertainty as to the enforceability of the settlement agreement presents a justiciable issue. Plaintiffs are correct that in some contexts, particularly where the issue involves the exercise of governmental power, uncertainty alone can give rise to a basis for judicial relief. *See e.g., Presbytery of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1458 (3d Cir. 1994). Here, however, where the City has been asked to exercise governmental authority— specifically the issuance of zoning and building permits for the development sites, and qualification for tax abatements—it has granted Plaintiffs' requests without incident. Plaintiffs raise the specter of the City "pulling" its permits with respect to these sites, Tr. at 29:3-9, which it did not do in 2006, or "engaging in litigation," Tr. at 29:7-9, but fails to recognize that the 2006 enforcement action arose out of specific violations of the City Code. Factually, all that has occurred causing the "uncertainty" that Plaintiffs raise is that Winther Investments, which is not a party here, has asked the City to take a position about the applicability of the settlement agreement as to one newly formed entity (Dobson Scotts), and its applicability to other hypothetical successors, and the City has simply declined to do so. As the City cogently observed at argument, Dobson Scotts has not even ruled out proceeding in a manner that would comply with the 2006 settlement agreement. Tr. at 39:17-40:4.

As to the Building Trades Council's stance on the enforceability of the settlement, Plaintiffs cite no communications since 2006 indicating an intent to litigate. At argument, counsel raised concern over union protests if they were to develop the sites using non-union labor, stating, "we need to know which way we're going to go. Are we going to go forward where we have two thousand union members [protesting] at the project?" Tr. at 29:3-9. But a judicial interpretation

as to the scope or enforceability of the 2006 agreement would not effectively address this concern, as unions would certainly still retain a right, subject of course to the limitation set forth in the second proviso to Section 8(b)(7)(c) of the NLRA, to engage in informational picketing or "hand billing" to express concern if the projects proceeded with non-union labor. Curiously, the only evidence cited by Plaintiffs about the possibility that the City or the Building Trades would bring litigation if Plaintiffs violated the settlement is deposition testimony from the former business manager of the Philadelphia Building Trades Council, Patrick Gillespie.  Patrick Gillespie Dep. at 9:12-19; 33:16-37:17, Ex. 9 to Pls.' Mot. Summ. J., ECF 38-1.  However, at the time of Gillespie's deposition, it had been six years since he last worked for the Philadelphia Building Trades Council, and the testimony he provided was not on behalf of the Building Council.  *Id.* at 9:10-14.  For obvious reasons, such testimony has little bearing on the current situation between the parties. Simply put, the speculation of a retired labor leader does not suffice to establish an actual case or controversy.

More specifically, I agree with Defendant that this case is not ripe under Article III or the "case of actual controversy" requirement of the Declaratory Judgment Act of 1934, 28 U.S.C.A. § 2201, the statute under which Plaintiff brings its current claims.  The Declaratory Judgment Act "is an enabling act, which confers discretion on the courts rather than an absolute right on a litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)).  "Declaratory judgments are often forward-looking, but they are 'limited to cases and controversies in the constitutional sense.'" *Sherwin-Williams Company v. County of Delaware, Pennsylvania*, 968 F.3d 264, 269 (3d Cir. 2020) (citing *Wyatt, Virgin Islands, Inc. v. Gov't of V.I.*, 385 F.3d 801, 805 (3d Cir. 2004) (citations omitted).  Courts may review only "concrete legal issues, presented in actual cases, not abstractions.... This is as true

of declaratory judgments as any other field." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)) (internal quotation marks omitted).  Although there is no precise definition as to what constitutes a case or controversy, "the facts alleged, under all circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pacific Coal & Oil Co*., 312 U.S. 270, 273 (1941)).

"Interrelated to…what constitutes a 'case of actual controversy'…is the ripeness doctrine." *Wyatt*, 385 F.3d at 806 (internal citations omitted).  The Court of Appeals for the Third Circuit ("Third Circuit") described the ripeness doctrine as follows:

> In determining whether a dispute has matured to a point to require judicial adjudication, courts must consider the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention.

*Id.* at 806 (internal quotations and citations omitted).  To determine whether a claim is ripe, courts examine the adversity of the interest between the parties, the conclusiveness of the declaratory judgment, and the practical help or utility of the declaratory judgment.  *Pic–A–State Pa. Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir. 1996) (citations omitted); *see also Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 646–47 (3d Cir. 1990).  All three elements must be present for a declaratory judgment action to be ripe.  *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995).[7]

---

[7] In the analysis below, I do not address the conclusiveness of any declaratory judgment, or whether it would have practical utility, because I have found that the Plaintiffs' actions are based on hypothetical events.

Here, there is insufficient adversity of interest, with the result that the action is not ripe for judicial consideration. "Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co.*, 72 F.3d at 1154. When "the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 412-13 (3d Cir. 1992). It is, however, not necessary for the party seeking a declaratory judgment to have suffered an actual harm to establish adversity of interest. *Id.* at 412. Rather, the element of adversity can be demonstrated so long as the "probability of that future event occurring is real and substantial,' 'of sufficient immediacy and reality.'" *Travelers Ins.,* 72 F.3d at 1154 (citing *Salvation Army v. Dep't of Cmty. Affairs,* 919 F.2d 183, 192 (3d Cir. 1990) (quoting *Steffel v. Thompson,* 415 U.S. 452, 460 (1974))).

Plaintiffs cannot establish that there is a reasonable probability "of sufficient immediacy and reality" that the City will bring litigation against them. Perhaps to bolster their argument that this is not a hypothetical situation, Plaintiffs point to the construction permits they have secured to develop the Dobson Scotts site. Certainly, this points to the fact that Plaintiff Dobson Scotts intends to develop the site,[8] a fact that the City—the very issuer of the permits—does not dispute. However, the Plaintiffs' request for declaratory relief is nonetheless dependent upon multiple future contingent acts—first, that Plaintiffs will in fact violate the 2006 settlement agreement which they have not conclusively asserted that they will do (as I already noted, Dobson Scotts has not ruled out proceeding in a manner that would comply with the 2006 settlement agreement),[9]

---

[8] Although Plaintiffs completed certain construction prerequisites with respect to the Dobson Scotts parcel, Plaintiffs have presented no evidence that Mansion at Bala or Dobson Mills have immediate plans to develop or sell their respective parcels.

[9] During his deposition testimony, Frederic Gautier testified it is possible that one of the bids Dobson Scotts may accept is from a unionized contractor. Ex. B at 81:21–85:10; Ex. P (Exhibit P is Exhibit 8 of Exhibit B) to Def's Mot. Summ. J, ECF 41-4.

and second, that if they do violate the agreement, the City will in fact sue, something that the City has never even threatened.  As a result, the purported dispute between Plaintiff and Defendants "is contingent upon events that may not occur at all or may occur differently than anticipated." *Wyatt*, 385 F.3d at 808 (citation omitted).

To support their argument that the case is ripe, Plaintiffs point to the language in *MedImmune*, 549 U.S. at 134, that a plaintiff need not "destroy a large building, bet the farm or risk treble damages and the loss of 80 percent of its business before seeking a declaration of its actively contested rights." *Id.*  There, a drug manufacturer disputed whether it had to pay certain patent-related fees to the defendant under the parties' licensing agreement.  *Id.* at 121-22.  When the defendant delivered petitioner a letter expressing its belief that a drug that petitioner had manufactured was covered by a patent and that petitioner owed royalties under the agreement, petitioner then *began paying* the disputed fees and initiated a declaratory judgment action challenging the validity and enforceability of the patent.   "[P]etitioner considered [respondent's]…letter to be a clear threat to enforce the…patent, terminate the…license agreement, and sue for patent infringement if petitioner did not make royalty payments as demanded."  *Id.* at 122.  On those facts, the Supreme Court held that the licensee was not required to terminate or breach a license agreement prior to seeking declaratory judgment.  *Id.* at 137.

The Supreme Court observed that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc.*, 549 U.S. at 128-29 (emphasis in original). For authority, it cited *Terrace v. Thompson*, 263 U.S. 197, 211-12, 216 (1923) which held that a landowner was not required to

commit a "violative act," *MedImmune Inc.*, 549 U.S. at 129, to challenge the constitutionality of newly enacted Anti-Alien Law where the state threatened the plaintiff with forfeiture of his farm, fines, and penalties if he entered into a lease with an immigrant. *See also Steffel*, 415 U.S. at 455-56, 459 (holding that plaintiff was not required to distribute handbills and risk prosecution where he had been specifically warned by police that such actions would likely result in prosecution before seeking a declaratory judgment). In *MedImmune*, the Court extended this reasoning as to governmental entities to private actors where a meaningful degree of coercion is exerted by one party upon another. 549 U.S. at 131-32.

Plaintiffs contend that this case is analogous to *MedImmune* because they must violate the settlement agreement before seeking a declaration that the agreement is unenforceable. Importantly, however, unlike in *MedImmune* where the opposing party sent a letter that could be understood as a clear threat to enforce a patent—a threat sufficiently clear that the recipient started paying royalties—neither the City of Philadelphia nor the Building Trades Council has threatened *anything*. Moreover, I am persuaded by the City's contention that to read *MedImmune* so broadly would mean that anytime there is a contract dispute where a party contemplates breaching a contractual agreement, a declaratory judgment is appropriate or warranted. The Court in *MedImmune* relied on the principle of coercion, and it is certainly not the case here that Plaintiffs are risking 80 percent of their business and treble damages.

Further, the Plaintiffs argue that the City's failure to take a position as to the applicability and enforceability of the settlement agreement is by itself a threat to sue, and therefore the probability of the future event occurring (litigation brought by the City) is "real and substantial" and of "sufficient immediacy." In support of this argument, Plaintiffs rely on *Presbytery of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1458 (3d Cir. 1994). In *Presbytery*, a

pastor sought a declaration that amendments to a law violated his First Amendment rights. The District Court held that the case was not ripe, and the Third Circuit reversed, reasoning that the controversy was ripe because the state refused to offer assurance that it would not prosecute the pastor if he spoke out against "homosexual acts" outside of his church. *Id*. The Court reasoned that parties have Article III standing where the government fails to provide assurance that it will not take enforcement action against certain conduct. *Id.* In that factual context, the immediacy of the plaintiff's concern is obvious. It would be unfair for the government—acting in its capacity as an enforcer of the law—to refuse to provide clarity as to the scope of the law and whether an individual would face criminal prosecution if he violated it. Similar urgency does not exist here, nor is the government here acting as an enforcer of the law. In this case, the City is a private party to a contract and is not in a position to impose criminal liability. It would take the holding of *Presbytery* too far to conclude that any time a private party does not provide a response to an inquiry about a contract, its silence is indicative of a threat. As such, the City's mere failure to respond to an email inquiry as to what actions—if any—it would take against the developer entities if they violated the settlement agreement is simply not a threat to sue or to revoke permits let alone a chilling use of governmental power.

Moreover, this case does not involve a First Amendment claim that the Plaintiffs are being deterred from expressing themselves as in *Presbytery*.[10] The Third Circuit has limited the holding of *Presbytery* to the First Amendment context. In *Pennsylvania Prison Soc. v. Cortes*, 508 F.3d 156, 169 (3d Cir. 2007), the Third Circuit reasoned that "[a] *First Amendment claim,* particularly a facial challenge, is subject to a relaxed ripeness standard.... The courts have repeatedly shown

---

[10] The Second Amended Complaint asserts that there is a "substantial question" for resolution under *Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S.Ct. 2448 (2018), ECF 32, ¶ 58, but does not allege any limitation on free expression.

solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression among those who forbear speaking because of the law's very existence." (citing *Presbytery*, 40 F.3d at 1458).

The other cases cited by Plaintiffs for the proposition that their claims are ripe similarly fall short of the mark.    In *Wayne Land and Mineral Group, LLC v. Delaware River Basin Commission*, 894 F.3d 509 (3d. Cir. 2018), the Delaware River Basin Commission, a government commission, issued a moratorium banning most natural gas fracking projects within a certain area unless there was prior Commission approval.  *Id.* at 518.  An energy company that wanted to commence fracking sought a declaratory judgment that the controlling interstate compact did not give the Commission authority to require such approval.  Although the plaintiff had neither proceeded with the fracking project nor requested a jurisdictional determination from the Commission, the Third Circuit deemed the conflict ripe.   *Id.* at 522-23.  The Court reasoned that to seek a jurisdictional determination or submit materials for project review, the company would necessarily incur significant expenses and legal risk, or risk substantial fines for non-compliance. *Id.* at 523.

Here, by Plaintiffs' own account, the Dobson Mills project is fully planned. Unlike the Commission in *Wayne*, the City has not asserted any power subject to challenge and has in fact granted all of Dobson's requests.  And even assuming a dispute over the enforceability of the prior settlement, putting hyperbole to the side, Plaintiffs have not shown that their only recourse would be "inordinately expensive and impractical." *See Sherwin-Williams Co. v. County of Delaware, Pennsylvania*, 968 F.3d 264, 270 (3d Cir. 2020).

Nor is Plaintiffs' situation here analogous to *Khodara Envt'l, Inc. v. Blakely,* 376 F.3d 187, 194 (3d Cir. 2004). In *Khodara*, the Court considered whether "a federal statute precluded development of a landfill. Instead of developing the landfill first and risking enforcement actions by the government, the plaintiff sought a judgment declaring its rights under federal law." *Sherwin Williams Co.*, 968 F.3d at 270 (discussing *Khodara Envt'l, Inc.*, 376 F.3d at 194). The Third Circuit held that the claims were ripe, but took pains to emphasize—twice—the "particular circumstances" of the case at issue, namely that a landfill developer needed clarity as to the scope of a federal statute which had been enacted *after* the developer entered into a consent order with the state Department of Environmental Protection regarding the construction of the landfill, further complicated by amendment of the federal statute while the appeals were pending before the circuit. *Id.* at 191-92, 194. I find it particularly telling that in *Khodara*, the Third Circuit cited decisions from other circuits where the claims involved the constitutionality or legality of newly enacted laws. *See Gary D. Peake Excavating, Inc. v. Town Bd. of the Town of Hancock*, 93 F.3d 68 (2d Cir. 1996); *Triple G Landfills, Inc.* v. *Bd. of Comm'rs of Fountain Cnty.*, 977 F.2d 287 (7th Cir. 1992). Like *Wayne, Khodara* involved the exercise of governmental authority against a factual background of significant changes in the law and litigants who faced substantial expenses and risk. No such circumstances exist here.

Significantly, in *MedImmune,* the case upon which Plaintiffs most heavily rely, the Supreme Court cautioned that "the Declaratory Judgment Act does not allow federal courts to give advisory rulings on the potential success of an affirmative defense before a cause of action has even accrued." 549 U.S. at 143 (citing *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (dismissing a case that "attempt[ed] to gain a litigation advantage by obtaining an advance ruling on an affirmative defense.")); *see also Coffman v. Breeze Corps.,* 323 U.S. 316, 324 (1945) ("The

declaratory judgment procedure ... may not be made the medium for securing an advisory opinion in a controversy which has not arisen.").[11]  As artfully stated by another district court, Plaintiffs seek a "rul[ing] on the viability of a hypothetical claim which may never be brought, and an affirmative defense that may never be asserted," which would be an advisory opinion that a court may not provide.  *Transamerica Life Ins. Co. v. Daibes Gas Holdings Atlanta*, L.L.C., 2018 WL 5033755 at *2–3 (D.N.J. Oct. 17, 2018).

III.    Conclusion

Because there is no case or controversy, this case must be dismissed.  An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[11] In advancing one of their many theories—the invalidity of the settlement under the National Labor Relations Act—Plaintiffs cite *Joseph W. Davis, Inc. v. Int'l Union of Operating Ena'rs, Local* 542, 636 F.Supp.2d 403 (E.D.Pa. 2008), as a basis for this Court's jurisdiction. There, however, Judge Yohn took care to detail the facts giving rise to the existence of a dispute, which included oral notification of a breach, followed by a formal letter of grievance, followed by a demand for arbitration.  *Id.* at 411.